Frederick J. CHRISTOPHER, Jr., Benton Cole, Salvatore Lo Dico, George C. Smith, and Raymond J. Meredith, Plaintiffs,

v.

John N. MITCHELL, as Attorney General of the United States, and the New York City Board of Elections, consisting of James M. Power, Thomas Mallee, Maurice J. O'Rourke, and J. J. Duberstein, Defendants.

Civ. A. No. 1862–70.

United States District Court, District of Columbia.

Oct. 2, 1970.

As Amended Oct. 7 and Nov. 5, 1970.

Alfred Avins, New York City, for plaintiffs.

David Norman, Deputy Asst. Atty. Gen., with whom Thomas A. Flannery, U. S. Atty., Jerris Leonard, Asst. Atty. Gen., David L. Marblestone and Jeremy I. Schwartz, Attys., Dept. of Justice, were on the brief, for defendant John N. Mitchell. David L. Marblestone and Peter L. Strauss, Washington, D. C., also entered appearances for Mr. Mitchell.

Norman Redlich, First Assistant Corporation Counsel of City of New York, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom J. Lee Rankin, Corporation Counsel of the City of New York, Leonard Bernikow, Atty., New York City Law Dept., was on brief, for defendant New York City Board of Elections.

Senator Edward M. Kennedy, of the bar of the Supreme Judicial Court of Massachusetts, pro hac vice, by special leave of court, argued this cause as amicus curiae in support of defendants' position, on behalf of Youth Franchise Coalition and others.

Amicus curiae briefs in support of defendants' position were filed by William A. Dobrovir and H. David Rosenbloom, Washington, D. C., for Youth Franchise Coalition and others, Joseph L. Rauh, Jr., Washington, D. C., for Americans for Democratic Action, Nathaniel R. Jones, New York City, Clarence Mitchell, Baltimore, Md., and J. Francis Pohlhaus, Washington, D. C., for the National Association for the Advancement of Colored People, Melvin L. Wulf, New York City and Lawrence G. Sager for the American Civil Liberties Union, David Rubin, New York City, for the National Education Association, and Stephen I. Schlossberg and John A. Fillion, Detroit, Mich., for International Union, United Automobile Workers; by Leonard B. Sand and Barry I. Fredericks, New York City, for the WMCA Vote at 18 Club; by John R. Cosgrove, Menlo Park, Cal., for Citizens for Lowering the Voting Age—California and others; and by Nathaniel R. Jones, New York City, Clarence Mitchell, Baltimore, Md., and J. Francis Pohlhaus, Washington, D. C., for the Department of Armed Services and Veterans' Affairs of the NAACP.

Prof. William W. Van Alstyne, Durham, N. C., of the bar of the Supreme Court of California, pro hac vice, by special leave of court, filed a brief and argued this cause as amicus curiae (appointed by the court).*

Before BAZELON, Chief Judge, MacKINNON, Circuit Judge, and BRYANT, District Judge.

OPINIONS

BAZELON, Chief Judge:

At issue in this case are the Voting Rights Act Amendments of 1970.[1] These provisions are reprinted in Appendix A of this opinion, but they may be briefly

* Prof. Van Alstyne of Duke University Law School was appointed by this court sua sponte, not to support either of the parties' positions, but to assist the court in its deliberations. We are very grateful to him for his scholarly and helpful response.

1. Public Law 91–285, 91st Cong., 2d Sess., 84 Stat. 314, signed by the President on June 22, 1970.

stated. First, the new law extends for five years the operation of section 4(a) of the Voting Rights Act of 1965,[2] the primary effect of which provision was to suspend the use of literacy tests in six southern states and part of a seventh state.[3] Second, it provides that the 50 per cent coverage formula of section 4 (b),[4] which took as its base the 1964 presidential election, may also be computed from the 1968 presidential election figures. In addition, the 1970 Amendments add two new titles to the Voting Rights Act. Title II contains provisions which (1) suspend all voting "tests and devices"[5] in states not already covered by the Voting Rights Act as amended, and (2) abolish state durational residency requirements in presidential elections. Title III prohibits states from denying the vote on the basis of age to citizens eighteen years of age or older.[6]

Plaintiffs are citizens of New York State, over twenty-one years of age, able to read and write the English language, and resident in their respective counties for more than three months. They are qualified to vote under the laws of the State[7] and are duly registered. They claim that enforcement of the Voting Rights Act as amended will dilute their votes in forthcoming elections. Accordingly, they seek a declaratory judgment that the Amendments are unconstitutional and an injunction restraining defendants—the Attorney General of the United States and the New York City Board of Elections—from enforcing the 1970 Amendments. Because plaintiffs seek to enjoin the enforcement of an Act of Congress, a statutory three-judge court was convened. 28 U.S.C. §§ 2282, 2284. Defendants moved for summary judgment on the merits with respect to plaintiffs' challenges to Titles II and III; they moved to dismiss those counts challenging Title I or, in the alternative, for summary judgment on the merits.[8] Plaintiffs cross-moved for summary judgment on all counts.

We find that Congress did have the power to enact the challenged provisions of the Voting Rights Act Amendments of 1970 and therefore grant summary judgment for the defendants.

---

2. 42 U.S.C. § 1973b(a).

3. Alabama, Georgia, Louisiana, Mississippi, South Carolina, Virginia, and a number of counties in North Carolina. *See* Hearings on H.R. 4249, etc., Before Subcomm. No. 5 of the House Comm. on the Judiciary, 91st Cong., 1st Sess. 92–93 (1969) [hereinafter cited as House Hearings].

4. 42 U.S.C. § 1973b(b).

5. Section 201(b):

> As used in this section, the term "test or device" means any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

This section merely repeats the definition of "test or device" that appears in the original Voting Rights Act of 1965. 42 U.S.C. § 1973b(c).

6. Title III does not go into effect until January 1, 1971. Section 305. The rest of the amendments, however, went into effect immediately.

7. N.Y.Const. art. II, § 1, provides in pertinent part:

> "Every citizen shall be entitled to vote at every election for all officers elected by the people and upon all questions submitted to the vote of the people provided that such citizen is twenty-one years of age or over and shall have been a resident of this state, and of the county, city, or village for three months next preceding an election. * * * [N]o person shall become entitled to vote by attaining majority, by naturalization or otherwise, unless such person is also able, except for physical disability, to read and write English."

8. Defendants do not deny that plaintiffs state causes of action and have the requisite standing in challenging Title II and III, and we see no need to discuss the matter *sua sponte.*

## I. Title I—The Amendments to Section 4 of the Voting Rights Act of 1965

Sections 4(a) and 4(b) of the Voting Rights Act of 1965 [9] suspended the use of any "test or device" [10] in any state or political subdivision

which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964.[11]

The suspension was not absolute; a state or subdivision could escape it by proving in court

that no such test or device has been used during the [five] years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color * * *.[12]

These provisions were found to be an appropriate exercise of congressional power under section 2 of the Fifteenth Amendment in South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L. Ed.2d 769 (1966).

The 1970 Amendments extend the provisions of the 1965 Act for five years.[13] In addition, they provide that the 1968 presidential election will now be taken as the base for the coverage formula, as well as the 1964 election. Therefore, if in any state or subdivision less than 50 per cent of the persons of voting age residing therein were registered on November 1, 1968, or if less than 50 per cent of such persons voted in the 1968 presidential election, then the section 4 (a) prohibition of literacy tests and other devices shall apply.

### Standing and Ripeness

Plaintiffs live in counties in New York State which were not reached by application of the old coverage formula. Three of them live in New York County, which they allege will be covered if the 50 per cent calculation is based upon voting and registration figures for the 1968 presidential election. Defendants reply that the Director of the Census has not yet made the determination required by section 4(b) of the Voting Rights Act as amended, because he is waiting for the 1970 census figures on New York to come in.[14] Therefore, defend-

9. 42 U.S.C. § 1973b(a) & (b).

10. *See* note 5 *supra.*

11. 42 U.S.C. § 1973b(b).

12. *Id.* § 1973b(a).

13. The effect of the 1970 Amendments on sections 4 and 5 of the Voting Rights Act of 1965, is shown in Appendix B *infra.*

14. Letter to Mr. Jerris Leonard of the Justice Department from Mr. George H. Brown, Director, Bureau of the Census, July 27, 1970:

This will acknowledge your letter of July 24 concerning determinations to be made by us under the Voting Rights Act Amendments of 1970, Public Law 91–285.

In making these determinations, we expect to follow the same general rules as used by us earlier in connection with the 1965 Act. Consequently, we believe the determinations under the Amendments need to wait for the results of the 1970 census. These will become available to us on a flow basis starting next month with the largest states, such as California and New York, becoming available toward the end of the year. The 1970 census results will give us a basis for making firm estimates of the population of voting age as of November 1968 required as denominators for determining the percent voting in the 1968 elections.

Unless determinations of the Voting Rights Amendments can be made on the basis of the 1970 census (interpolated back to November 1968), it would be necessary to use data extrapolated for the eight-year period since the 1960 census. This latter procedure would be self-defeating since in many instances we could not in good conscience make the determinations without the benefit of new benchmark data. New benchmark data will be uniformly provided by the 1970 census results.

ants assert, plaintiffs' attack on Title I of the 1970 Amendments is premature.

 The issue raised is a troublesome one, but after careful reflection we have concluded that plaintiffs' challenge to the amendments to section 4 of the Voting Rights Act of 1965 does satisfy the requirements of standing and ripeness. First, it is clear that there is a danger that section 4(a) as amended will apply to New York County, whenever the determination is made by the Director of the Census. Plaintiffs' assertions to this effect were uncontested by defendants. This danger seems to us substantial enough to satisfy the conditions of standing in the narrow sense.[15] Second, it is very possible that the determination by the Census Director will be made before the approaching election in November. Not only may the 1970 census figures for New York be available before the election, but the Census Director may decide that he has a legal duty to make a determination on the best figures available to him before the election is held.[16] Third, to the extent that the Census Director delays as long as possible before making a determination prior to the election, judicial review of the statute in time to prevent irremediable harm to plaintiffs becomes difficult.[17] Finally, upon our view of

---

15. *See* Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); Poe v. Ullman, 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). The flat ban on literacy tests—section 201 of Title II —which we uphold in this opinion (pp. 1006–1007 *infra*) might seem to preclude a finding that there was a threat of actual *harm* to plaintiffs, since that section will ban New York County's literacy test even if the county does not fall within the 50 per cent coverage formula. While true, this observation blurs the fact that section 4 as amended and section 201 are complementary; the coverage of the one is defined in terms of the coverage of the other. *See* note 53 *infra*. To the extent that there is doubt whether the county falls within the coverage formula, there is doubt under which section of the Act the literacy test will be suspended. We do not feel that this doubt can prevent plaintiffs from having standing to challenge both sections, when it is undisputed that one or the other section will apply in the near future, and when the risk that either one will apply is substantial. The question raised by section 201, therefore, becomes only an aspect of the issue of ripeness.

16. Section 4(b) of the Voting Rights Act as amended reads, "A determination * * * of the Director of the Census under this section * * * shall not be reviewable in any court * * *." We consider that it would be incorrect to read this provision as permitting the Census Director to delay making a determination whether New York County fell within the coverage formula until after the November election. Granted that waiting for the 1970 census figures would give a more accurate estimate of New York population in 1968, see note 14 *supra*, such a delay would frustrate a statute written to go into effect immediately. Accuracy of estimate cannot be so paramount a claim when the 50 per cent figure approved in South Carolina v. Katzenbach, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed. 2d 769 (1966), was obviously an arbitrary, though rational, effort at line-drawing. Congress could have given the Census Director the power to wait indefinitely for the 1970 figures, but any court would hesitate, we feel, to read such a result into the innocuous language of section 4(b).

17. Nothing in note 16 *supra* should be taken as suggesting that it is not appropriate for the Census Director to continue to wait for the 1970 census figures, so long as a determination on the best available figures is made in time for the November elections. But it is just this delay which will leave plaintiffs little time for judicial action and appeals. We are not unaware that the court system can act rapidly in special emergencies, but we do not feel that this possibility binds us to refuse consideration of this issue. There is a countervailing interest in the stability of election procedures during the time immediately preceding an election.

To be sure, a finding of ripeness in this case carries with it the possibility that between the date of our opinion and the November election the Census Director will receive the 1970 figures and determine that New York County does not fall within the coverage formula. If not an argument against reaching the merits before such a determination, this may suggest that we should withhold our opinion until it is more likely that the 1970 figures will not be forthcoming in time for the election. It seems to us that the answer to this

the merits of the amendments to section 4, there is no reason for waiting for the issue to be presented in a more "concrete situation," [18] rather than on cross motions for summary judgment. All these considerations persuade us that in the exercise of the discretion required of us in injunctive and declaratory actions,[19] we may appropriately find this controversy ripe for adjudication.

### The Constitutionality of the Amendments to Section 4

■ Section 1 of the Fifteenth Amendment provides: "The right of citizens of the United States to vote shall not be denied or abridged * * * by any State on account of race, color, or previous condition of servitude." Section 2 provides: "The Congress shall have power to enforce this article by appropriate legislation." The Court in South Carolina v. Katzenbach faced the argument that the Fifteenth Amendment permits only the judiciary to strike down state statutes and procedures—that "to allow an exercise of this authority by Congress would be to rob the courts of their rightful constitutional role." [20]

This argument was emphatically and unanimously rejected by the Court.[21]

By adding [§ 2], the Framers indicated that Congress was to be chiefly responsible for implementing the rights created in § 1. "It is the power of Congress which has been enlarged. Congress is authorized to *enforce* the prohibitions by appropriate legislation. Some legislation is contemplated to make the [Civil War] amendments fully effective." Ex parte State of Virginia, 100 U.S. 339, 345, 25 L.Ed. 676.[22]

The measure of congressional power under the enforcement provision of the Fifteenth Amendment is "the same as in all cases concerning the express powers of Congress with relation to the reserved powers of the States." [23] The test, then, is that enunciated by Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819):

Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end,

---

suggestion lies in our function as the base court in an expedited judicial procedure specially enacted by Congress for cases which seek to enjoin the enforcement of an Act of Congress. 28 U.S.C. §§ 1253, 2282, 2284. Any delay on our part in a case like the one at hand reduces the amount of time that the Supreme Court will have for consideration of the issues in the case. If it is appropriate for a court to delay issuing an opinion as suggested, we feel that it must be the last court in the line of appeals which exercises this discretion.

As a final point, it may seem peculiar to speak of "irremediable harm" when it appears that section 201 of the amended Act will ban New York's literacy test whatever our decision on section 4(a). *See* note 15 *supra.* But we may take judicial notice of the fact that provisions of the Voting Rights Act Amendments of 1970 are on appeal before the Supreme Court and are set for argument before the election. The constitutional bases for section 4 as amended and section 201 are different, so it is possible that section 201 will be struck down while the constitutionality of section 4 is upheld or not

reached by the court. Here again, the imminence of the election militates in favor of our reaching the merits.

18. *See* Toilet Goods Assn. v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

19. *See* Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

20. 383 U.S. at 325, 86 S.Ct. at 817.

21. Justice Black concurred and dissented, but his disagreement was on other grounds. He specifically agreed with the Court's holding that Congress had acted properly under section 2 in enacting the Voting Rights Act of 1965.

"* * * § 2 of the Amendment unmistakably gives Congress specific power to go further and pass appropriate legislation to protect this right to vote against any method of abridgement no matter how subtle." 383 U.S. at 355, 86 S.Ct. at 832.

22. *Id.* at 325–326, 86 S.Ct. at 817.

23. *Id.* at 326, 86 S.Ct. at 817.

which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

The essential question for the Court, accordingly, was whether Congress had enacted a statute which was a rational means of effectuating the constitutional prohibition of racial discrimination in voting.[24] Given the history of discrimination in the use of voting tests in the South, the Court found ample reason to find that the congressional enactment was an appropriate means of protecting the right to vote. Most important, it was appropriate to tie coverage of the statute to the percentage turnout or registration for the 1964 election.

> The formula eventually evolved to describe [the areas affected by the Act] was relevant to the problem of voting discrimination, and Congress was therefore entitled to infer a significant danger of the evil in the few remaining States and political subdivisions covered by § 4(b) of the Act.[25]

There can be no doubt after South Carolina v. Katzenbach that Congress acted within its section 2 power in enacting the 1970 Amendments to section 4. If it was appropriate for Congress

in 1965 to base coverage on a 50 per cent standard and the most recent presidential election, then plaintiffs have a heavy burden if they wish to persuade us that it is inappropriate for Congress to base coverage *again* on the most recent presidential election when, in 1970, it is extending the original Act for five years. Plaintiffs have shown no significant difference between the two elections. Nor do we read the Court's opinion in South Carolina v. Katzenbach as relying upon certain unique characteristics of the 1964 election.[26] It may be true, as plaintiffs claim, that New York County does not have a history of discrimination in the use of its literacy test.[27] Nevertheless,

> [t]ests and devices are relevant to voting discrimination because of their long history as a tool for perpetrating the evil; a low voting rate is pertinent for the obvious reason that widespread disenfranchisement must inevitably affect the number of actual voters. Accordingly, the coverage formula is rational in both practice and theory.[28]

We uphold the 1970 Amendments to section 4 of the Voting Rights Act of 1965.[29]

24. The argument that the Act was prohibited by the Constitution would have to rest on the conclusion that the Constitution vested power over voter qualifications exclusively in the States. *See* p. 1006 *infra*.

25. 383 U.S. at 329, 86 S.Ct. at 819.

26. The Court did say the following:
 The areas listed above, for which there was evidence of actual voting discrimination, share two characteristics incorporated by Congress into the coverage formula: the use of tests and devices for voter registration, and *a voting rate in the 1964 presidential election at least 12 points below the national average.* 383 U.S. at 330, 86 S.Ct. at 819 [emphasis added]. As the only such reference in an opinion which repeatedly emphasized the general rationality of tying coverage under the statute to the voting rate, we cannot say that it precludes the 1970 Amendment.

27. Under Section 4(a), 42 U.S.C. § 1973b (a), if plaintiffs can prove their claim in

the United States District Court for the District of Columbia, their county may be exempted from the section 4(a) prohibition. *But see* Gaston County v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969), discussed at p. 1007 *infra*, and Section 201 of the Voting Rights Act as amended, note 53 *infra*.

28. South Carolina v. Katzenbach, 383 U.S. at 330, 86 S.Ct. at 819.

29. Plaintiffs also challenge the 1970 Amendments to section 5 of the Voting Rights Act of 1965. *See* Appendix B *infra*. They alleged in their complaint that section 5 as amended would affect New York County, but defendants denied any immediate impact, and the provision played no further part in this litigation. Since plaintiffs have made no showing that section 5 is likely to be applied to any specific law, regulation or procedure of New York County, we think that at the very least they have not demonstrated that their claim is ripe for injunctive and declaratory relief. We therefore dismiss without prejudice those parts of plain-

## II. Katzenbach v. Morgan

We turn now to the case which followed South Carolina v. Katzenbach by three months and which constitutes the most important opinion by the Supreme Court on the question of congressional power under the enforcement provisions of the Civil War Amendments. Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), was a declaratory judgment action brought by New York voters joined by the state attorney general to challenge the constitutionality of section 4(e) of the Voting Rights Act of 1965.[30] That section provided that no state could bar any person from voting solely on grounds of English illiteracy if that person could demonstrate that he had been educated in an American-flag school "in which the predominant classroom language was other than English." The sole practical effect of section 4(e) was to enfranchise Puerto Ricans living in New York State who had been barred from voting by that state's literacy requirement.[31]

In upholding the constitutionality of section 4(e), the Court applied to section 5 of the Fourteenth Amendment—"The Congress shall have power to enforce, by appropriate legislation, the provisions of this article"—the doctrine enunciated in South Carolina v. Katzenbach. The question before the Court was not the constitutionality of the New York law, but the following:

Without regard to whether the judiciary would find that the Equal Protection Clause itself nullifies New York's English literacy requirement as so applied, could Congress prohibit the enforcement of the state law by legislating under § 5 of the Fourteenth Amendment? In answering this question, our task is limited to determining whether such legislation is, as required by § 5, appropriate legislation to enforce the Equal Protection Clause.[32]

And once again, the Court quoted Chief Justice Marshall:

Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.[33]

Thus far, the Court was only repeating its unanimous opinion in South Carolina v. Katzenbach. Yet two members of the Court dissented strongly from the conclusion that section 4(e) was an appropriate enactment to enforce the Equal Protection Clause. Justices Harlan and Stewart agreed that

* * * § 5 most certainly does give to the Congress wide powers in the field of devising remedial legislation to effectuate the Amendment's prohibition on arbitrary state action * *,[34]

but they found the South Carolina doctrine inapplicable.

Section 4(e) * * * presents a significantly different type of congressional enactment. The question here is not whether the statute is appropriate remedial legislation to cure an established violation of a constitutional command, but whether * * * a particular state practice or, as here, a statute is so arbitrary or irrational as to offend the command of the Equal Protection Clause * * *.[35]

In Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), the Court had upheld a state's English literacy requirement against constitutional attack. Therefore, said Mr. Justice Harlan,

tiffs' counts which challenge the amendments to section 5.

30. 42 U.S.C. § 1973b(e).

31. N.Y.Const. Art. II, § 1; N.Y.Election Law, McKinney's Consol. Laws, c. 17, §§ 150, 168. *See* note 7 *supra.*

32. Katzenbach v. Morgan, 384 U.S. at 650, 86 S.Ct. at 1723.

33. McCulloch v. Maryland, 4 Wheat. 316, 421, 4 L.Ed. 579 (1819).

34. 384 U.S. at 666, 86 S.Ct. at 1735.

35. *Id.* at 667, 86 S.Ct. at 1736.

I do not think it is open to Congress to limit the effect of that decision as it has undertaken to do by § 4(e). In effect the Court reads § 5 of the Fourteenth Amendment, as giving Congress the power to define the *substantive* scope of the Amendment. If that indeed be the true reach of § 5, then I do not see why Congress should not be able as well to exercise its § 5, "discretion" by enacting statutes so as in effect to dilute equal protection and due process decisions of this Court.[36]

The doubts and fears expressed by the dissenting Justices have not been stilled in the four years since Katzenbach v. Morgan.[37] Accordingly, although this court is bound to follow the opinion of the Court, the importance of the general question, as well as the importance of the particular issues presented by the statute in this case, demands that we examine carefully the justifications that the Court gave for holding that section 4(e) may be regarded as an enactment "to enforce the Equal Protection Clause."

The majority opinion gave two grounds for sustaining section 4(e). First:

[Section] 4(e) may be viewed as a measure to secure for the Puerto Rican community residing in New York nondiscriminatory treatment by government—both in the imposition of voter qualifications and the provision or administration of governmental services * * *.

Section 4(e) may be readily seen as "plainly adapted" to furthering these aims of the Equal Protection Clause.

The practical effect of § 4(e) is to prohibit New York from denying the right to vote to large segments of its Puerto Rican community. * * * This enhanced political power will be helpful in gaining nondiscriminatory treatment in public services for the entire Puerto Rican community. Section 4(e) thereby enables the Puerto Rican minority better to obtain "perfect equality of civil rights and the equal protection of the laws."[38]

This may be described as the "remedial" or "ameliorative" rationale of Katzenbach v. Morgan. The potential evil—discrimination by government against an ethnic minority—is so clearly within the Equal Protection Clause as to need no discussion. Given that, the Court gave Congress wide latitude in choosing means to protect against the evil.

It was well within congressional authority to say that this need of the Puerto Rican minority for the vote warranted federal intrusion upon any state interests served by the English literacy requirement. It was for Congress * * * to assess and weigh the various conflicting considerations * * *.[39] It is not for us to review the congressional resolution of these factors. It is enough that we be able to *perceive a basis* upon which the Congress might resolve the conflict as it did.[40] [Emphasis added.]

While this rationale seems well within the expansive reading of Congress's power given in South Carolina v. Katzenbach, Mr. Justice Harlan was correct in noting that an additional step had been taken. In the provisions of the Voting

---

36. *Id.* at 668, 86 S.Ct. at 1736.

37. *See, e. g.,* statement and testimony of Dean Louis H. Pollak, Yale Law School, Hearings on Lowering the Voting Age to 18 Before the Subcomm. on Constitutional Amendments of the Senate Judiciary Comm., 91st Cong., 2d Sess. 249–73 (1970).

38. 384 U.S. 652–653, 86 S.Ct. at 1724.

39. " * * * the risk of pervasiveness of the discrimination in governmental services, the effectiveness of eliminating the state restriction on the right to vote as a means of dealing with the evil, the adequacy or availability of alternative remedies, and the nature and significance of the state interests that would be affected by the nullification of the English literacy requirement as applied to residents who have successfully completed the sixth grade in a Puerto Rican school."

384 U.S. at 653, 86 S.Ct. at 1725.

40. *Id.*

Rights Act of 1965 upheld in *South Carolina,* Congress had suspended state literacy tests concerning which there was a showing of great danger—based on past experience—that they would be discriminatorily applied. In *Katzenbach,* however, the connection between suspended state statute and possible discrimination was more tenuous. The first rationale, then, showed that the court seriously intended to give wide scope to Congress's ameliorative powers. On the other hand, the role of judicial review remained clear. As the often repeated quote from Justice Marshall specifies, a court must make the initial—and independent—judgment whether the evil attacked by Congress is one which comes within the scope of the Equal Protection Clause.[41] Second, when purporting to act under section 5 of the Fourteenth Amendment, Congress may not itself deny persons equal protection or due process of law; such a claim would present another question concerning which a court is not bound to give unusual deference to congressional judgment.[42] Only after these preliminary decisions does the loose "able-to-perceive-a-basis" test enter as the standard for review of the appropriateness of the means Congress has chosen.

■ The second rationale for the Court's decision in *Katzenbach* was stated very differently and does not stem so directly from South Carolina v. Katzenbach. We think it necessary to quote extensively from the Court's opinion:

> The result is no different if we confine our inquiry to the question whether § 4(e) was merely legislation aimed at the elimination of an invidious discrimination in establishing voter qualifications. We are told that New York's English literacy requirement originated in the desire to provide an incentive for non-English speaking immigrants to learn the English language and in order to assure the intelligent exercise of the franchise. Yet Congress might well have questioned * * whether these were actually the interests being served. Congress might have also questioned whether denial of a right deemed so precious and fundamental in our society was a necessary or appropriate means of encouraging persons to learn English, or of furthering the goal of an intelligent exercise of the franchise. Finally, Congress might well have concluded that as a means of furthering the intelligent exercise of the franchise, an ability to read or understand Spanish is as effective as ability to read English for those to whom Spanish-language newspapers and Spanish-language radio and television programs are available to inform them of election issues and governmental affairs. Since Congress undertook to legislate so as to preclude the enforcement of the state law, and did so in the context of a general appraisal of literacy requirements for voting, see State of South Carolina v. Katzenbach * *, to which it brought a specially informed legislative competence, it was Congress' prerogative to weigh these competing considerations. Here again, it is enough that *we perceive a basis upon which Congress might predicate a judgment that the application of New York's English literacy requirement* to deny the right to vote to a person with a sixth grade education in Puerto Rican schools in which the language of instruction was other than English *constituted an invidious discrimination in violation of the Equal Protection Clause.*[43] [Emphasis added.]

This we may call the "discretionary" rationale of Katzenbach v. Morgan, and it is here that the Court's granting to

---

41. *See* United States v. Guest, 383 U.S. 745, 783–785, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966).

42. *See* 384 U.S. at 651 n. 10, 86 S.Ct. 1717, *quoted* at p. 1005 *infra.* While primarily directed at Mr. Justice Harlan's criticism of the second rationale, *infra,* this footnote appears in the Court's opinion before either rationale is presented.

43. 384 U.S. at 653–656, 86 S.Ct. at 1725–1726.

Congress the "power to define the substantive scope" of the Equal Protection Clause has seemed so potentially dangerous. The Court took pains, however, to limit congressional discretion under this rationale as it had under the first. Footnote 10, 384 U.S. at 651, 86 S.Ct. at 1724 reads:

> Contrary to the suggestion of the dissent, * * * § 5 does not grant Congress power to exercise discretion in the other direction and to enact "statutes so as in effect to dilute equal protection and due process decisions of this Court." We emphasize that Congress' power under § 5 is limited to adopting measures to enforce the guarantees of the Amendment; § 5 grants Congress no power to restrict, abrogate, or dilute these guarantees. * * * [44]

This footnote surely makes clear that when Congress has purported to act under this second rationale, but a plaintiff comes to court alleging that the congressional enactment denies him equal protection or due process of law, then a question has been presented upon which the court must make an independent judgment, giving Congress no more deference than is usual when such constitutional claims are made.[45] Whatever rationale Congress acts under, it is not permitted to abridge individual rights which the Supreme Court has in the past or would now protect.

■ The point of the "discretionary rationale," we think, is to permit Congress to make distinctions which the judicial branch of government, with its special obligation to make only principled decisions, would find difficult or impossible.[46] Congress can take a more generous view of the Equal Protection Clause than the courts, up to the point at which other persons' fundamental rights begin to be abridged; it cannot take a narrower view.[47] It is by no means clear that to permit Congress such discretion is more "unusual" or "dangerous to the federal system" than to apply the remedial rationale, which permits Congress to create criminal sanctions where all agree the courts would have no power under section 1 of the Fourteenth or Fifteenth Amendments.[48] The application of the remedial rationale in Katzenbach v. Morgan itself

44. This note was cited by the Court in Shapiro v. Thompson, 394 U.S. 618, 641, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

45. It might seem that more deference than usual *will* be given Congress when the enactment is claimed to abridge an equal protection right. For in Katzenbach v. Morgan itself, the Court met the objection that section 4(e) discriminates against Spanish-speaking citizens educated in non-American-flag schools by observing that section 4(e) was a "reform" measure and that "reform may take one step at a time." 384 U.S. at 657, 86 S.Ct. at 1727. Still, deference is not the only explanation for the Court's decision here. We note in passing that in Shapiro v. Thompson, 394 U.S. 618, 641, 89 S.Ct. 1322, 1335 (1969), the Court said, "Congress may not authorize the States to violate the Equal Protection Clause." Failure to prohibit is not necessarily authorization; therefore the Court's approval of section 4(e) would suggest nothing about the constitutionality of New York's continuing to discriminate in voting against Spanish speaking citizens educated abroad—from the point of view of the Court or from the point of view of Congress.

46. We do not pretend that this approach to Katzenbach v. Morgan is original. For one perceptive article supporting a similar analysis, *see* Robert A. Burt, Miranda & Title II: A Morganatic Marriage, 1969 Sup.Ct.Rev. 81.

47. It may be that in certain areas there is no room for congressional discretion—that the state laws are constitutional under the Court's interpretation of the Equal Protection Clause and any act of Congress striking them down would violate the Equal Protection Clause in a different way. This will not be typical, however, and we think that our discussion of the provisions of the 1970 Amendments indicates the very separate nature of the two questions.

48. *See* United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966).

indicates the breadth of congressional power on that theory. When Congress acts under either rationale, the courts will have a difficult task in allowing Congress its legitimate power under the enforcement provisions of the Fourteenth and Fifteenth Amendments, and at the same time keeping that power within constitutional bounds. But it is certainly not apparent that the task cannot be done, consistently with the principles of judicial review developed in our law.

We turn now to the remaining provisions of the Voting Rights Act Amendments of 1970.

### III. Applying the Katzenbach v. Morgan Rationales

The remaining provisions of the 1970 Amendments strike down, in order, state literacy requirements, certain state residency requirements for voting in presidential elections, and certain state age requirements. Just over five years ago, Justice Harlan could still say in dissent:

> Anyone not familiar with the provisions of the Fourteenth Amendment, the history of that Amendment, and the decisions of the Court in this constitutional area, would gather from today's opinion that it is an established constitutional tenet that state laws governing the qualifications of voters are subject to the limitations of the Equal Protection Clause. Yet any dispassionate survey of the past will reveal that the present decision is the first to so hold.[49]

No similar doubts about the state of the law could be held today. Holding Virginia's poll tax unconstitutional in 1966, the Court said:

> [O]nce the franchise is granted to the electorate, lines may not be drawn

which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment. * * * Our cases demonstrate that the Equal Protection Clause * * * restrains the States from fixing voter qualifications which invidiously discriminate.[50]

Just a few months ago, in an opinion concurred in by the eight then active members of the Court, that quotation was echoed. Moreover, the Court said,

> [t]he right to vote, as the citizen's link to his laws and government, is protective of all fundamental rights and privileges. * * * And before that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny.[51]

In short we are not here dealing with issues to which the application of the Equal Protection Clause is farfetched or surprising. Plaintiffs' historical argument that the Equal Protection Clause may not be applied to voting or to voter qualification laws has been resolved against them.[52] With that question decided, there are few issues indeed to which any notion of equality could have so central an application as the right to vote.

### The Ban on Literacy Tests

Section 201 of the Voting Rights Act as amended suspends until August 6, 1975, the use of literacy tests and any similar "test or device" in any state in which such tests are not already suspended by operation of section 4(a) of

---

49. Carrington v. Rash, 380 U.S. 89, 97, 85 S.Ct. 775, 780, 13 L.Ed.2d 675 (1965) (opinion of the Court by Mr. Justice Stewart).

50. Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 665–666, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169 (1966).

51. Evans v. Cornman, 398 U.S. 419, 422, 90 S.Ct. 1752, 1755, 26 L.Ed.2d 370 (1970).

52. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1965), and cases cited *supra*.

the Act.[53] Fifteen states will be immediately affected by this provision.[54]

■ Although the Supreme Court upheld against constitutional attack the North Carolina literacy test in Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed. 2d 1072 (1959), such requirements have been put in a precarious position by the Court's opinion in Gaston County, N. C. v. United States, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969). There the county brought an action under section 4(a) of the Voting Rights Act to escape suspension.[55] The Supreme Court concluded that in such an action

> it is appropriate for a court to consider whether a literacy or educational requirement has the "effect of denying * * * the right to vote on account of race or color" because the State or subdivision which seeks to impose the requirement has maintained separated and inferior schools for its Negro residents who are now of voting age.[56]

There is little question that the principle of this case has serious implications for many areas of the country outside the South.[57] Accordingly, we feel there is no need to make an extensive review of the hearings and findings of Congress to convince ourselves that there is a basis upon which Congress could predicate a judgment that state literacy requirements, at this point in time in our society, constitute an invidious discrimination in violation of the Equal Protection Clause.

■ Even the remedial rationale of Katzenbach v. Morgan is persuasive here. The ban on literacy tests is plainly adapted to enabling the Negro minority, for example, to obtain "nondiscriminatory treatment by government." The remedial nature of section 201 is further suggested by its expiration in five years. Thus not only its legislative history but its actual effect is closely tied to that paradigmatic remedial statute, the original Voting Rights Act of 1965.[58]

53. Section 201(a) reads:
Prior to August 6, 1975, no citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State as to which the provisions of section 4(a) of this Act are not in effect by reason of determinations made under section 4(b) of this Act.
The grammar of this sentence at first leads one to think that a state like Alaska—whose literacy test was banned under section 4(a) because it fell within the 50 per cent coverage formula, but which sued successfully in court to have the ban lifted—would *not* fall under the terms of section 201(a). All the briefs in this case have assumed that between section 4(a) and section 201 all literacy tests in the country would be prohibited. Since the language of the provision can be read to reach this result, and since we have seen nothing in the hearings or debates to suggest that Congress clearly intended to enact the other, more peculiar, result, we have assumed, without deciding, that all literacy tests which are not already prohibited do fall under Section 201.
We note that the date when the period of suspension under Section 201 is to

end corresponds to the time of operation of subsection 4(a) as amended.

54. Literacy tests are suspended by section 201 in Alaska, Arizona (except Yuma County), California, Connecticut, Delaware, Maine, Massachusetts, New Hampshire, New York, Oregon, Washington, Wyoming, and 61 counties of North Carolina. Moral character provisions are suspended in Connecticut and Idaho. *See* House Hearings, *supra* note 3, at 90. Hawaii's literacy test has been repealed. Hawaii Rev.Stat. § 11-4, as amended (1969).

55. The provision for escaping suspension is described at p. 998 *supra*. *See also* Appendix B *infra*.

56. 395 U.S. at 293, 89 S.Ct. at 1724.

57. *See, e. g.,* Hobsen v. Hansen, 269 F. Supp. 401 (D.D.C.1967), aff'd in part and remanded *sub nom.* Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).

58. Plaintiffs argue that section 201 covers areas that do not have histories of discriminatory use of literacy tests, and that unlike under section 4(a), there is no escape from the section 201 ban. It was not irrational for Congress to take account of the potential for discriminatory

*Abolition of Durational Residency Requirements in Presidential Elections*

Section 202(b) of the Voting Rights Act as amended states that Congress has found it necessary, to secure and enforce certain constitutional rights of citizens,

(1) to completely abolish the durational residency requirement as a precondition to voting for President and Vice President, and (2) to establish nationwide, uniform standards relative to absentee registration and absentee balloting in presidential elections.

Section 202(c) enacts the abolition of such durational residency requirements. Section 202(d) requires each state to provide for the registration of all otherwise qualified residents who apply at least 30 days before a presidential election. Section 202(e) provides that any otherwise qualified person who moves to a state or political subdivision within 30 days of a presidential election and who is not eligible to vote in his new location must be allowed to vote for President and Vice President, in person or by absentee ballot, in the state or subdivision in which he previously resided. The net result of these provisions is to make it possible for any otherwise qualified person to vote in a presidential election, regardless of the date at which he changes his residence.

■ In Drueding v. Devlin, 380 U.S. 125, 85 S.Ct. 807, 13 L.Ed.2d 792 (1965), the Supreme Court summarily affirmed a district court decision [59] upholding a one-year residency requirement which applied to presidential elections. In 1969, the Court dismissed as moot another challenge to a state's six-month residency requirement for voting in such elections,[60] but the two dissenting members of the Court reached the merits. Justice Marshall, with Justice Brennan concurring, said:

It seems to me clear that *Drueding* is not good law today. * * *

* * * [I]f it was not clear in 1965 it is clear now that once a State has determined that a decision is to be made by popular vote, it may exclude persons from the franchise only upon a showing of a compelling interest, and even then only when the exclusion is the least restrictive method of achieving the desired purpose.[61]

We think that nothing need be added to Mr. Justice Marshall's thorough discussion of the interests at stake to permit us to conclude that Congress could find that durational residency requirements violate the Equal Protection Clause.[62] A state's interest in attempting to guarantee that every voter be familiar with local issues before he votes for President can not be described as compelling, when measured against the importance of the right to the transient citizen. And the argument from administrative convenience seems weak when a substantial majority of the states permit registration by at least some classes of

use of literacy tests, and to take note of the difficulty that states would have of proving nondiscriminatory use in the future.

59. 234 F.Supp. 721 (D.Md.1964).

60. Hall v. Beals, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969).

61. *Id.* at 52, 90 S.Ct. at 203–204.

62. The opposing state interests he discussed were the state's parochial interest in the outcome of the election, insuring that the new resident understands local issues, protecting against non-resident voting, and administrative convenience.

It should be noted that while the qualifications for electors of members of Congress are tied in the Constitution to the qualifications of electors for the state legislatures, art. I, § 2, the provision regarding selection of the President merely says: "Each State shall appoint, in such manner as the legislature thereof may direct, a number of electors * * *" for the purpose of choosing a President and Vice President. Art. II, § 1. Therefore, while a state may have a compelling interest in local elections and tailor its voter qualification laws accordingly, it does not follow that equally strict qualifications for voting in presidential elections are required.

citizens up to the thirtieth day prior to a presidential election.[63] The scheme devised by Congress to apply uniformly throughout the country is an obviously rational means of ensuring that unnecessarily long residency requirements are not put into effect by states, and of simplifying for the voter the task of determining where he is permitted to vote.

### Reducing the Voting Age to 18 in Federal, State and Local Elections

■ Section 302 of the Voting Rights Act as amended reads:

Except as required by the Constitution, no citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any primary or in any election shall be denied the right to vote in any such primary or election on account of age if such citizen is eighteen years of age or older.

In considering this provision, we are met at the outset by the argument that section 2 of the Fourteenth Amendment constitutes a limitation upon the general language of section 1 and prevents an interpretation of "equal protection" which leads to a prohibition of state laws fixing the voter qualification age at 21 years. Section 2 reads:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, *being twenty-one years of age*, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens *twenty-one years of age* in such State. [Emphasis added.]

Initially, we note that what this section provides for is the reduction in representation in Congress for those states which deny the right to vote to a specified class of citizens. Thus the enactment itself places no limitation whatsoever upon the application of section 1. In fact, though, the class specified in section 2 reflects closely the voter qualification laws with respect to age, sex, and crime in the states at the time of the ratification of the Amendment. Several arguments then can be made for limiting section 1.

Mr. Justice Harlan, dissenting in Reynolds v. Sims, 377 U.S. 533, 589, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), argued that section 2 showed that section 1 was not intended to apply to voting at all. Alternatively, section 2 may show that section 1 was not intended to apply to state voting qualification laws. Whatever the strength of these historical arguments, they have been consistently rejected by the Supreme Court.[64] What is left, then, is to argue that the specific mention of *particular* bases for limiting the franchise manifests an understanding by the Framers that states could appropriately limit their electorate in those ways. Given the previous decisions of the Supreme Court which foreclose the issue of the Framers' intent with respect to some aspects of the application of the Fourteenth Amendment to voting, we think that only a very contrived argument could be presented that the Framers' understanding in regard to age, sex, and crime was sufficiently clear to restrict the meaning of section 1.

---

63. *See* 116 Cong.Rec. 3543 (daily ed., March 11, 1970) (memorandum on registration closing days submitted by Senator Goldwater).

64. Harper v. Virginia Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079 (1966); Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775 (1965); Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752 (1970).

In his scholarly discussion of the legislative history of the Equal Protection Clause and section 2 of the Fourteenth Amendment, Judge MacKinnon concludes that whether the Framers intended to approve 21 as the legal voting age is a question that must remain unanswered. We fully concur. But whatever the Framers' understanding, the essential point for us is that they did not enact it into law. What they did was to guard against increased Southern representation in Congress from the end of the Three-Fifths Compromise,[65] while at the same time providing for a severe sanction if any state discriminated against voters in the manner most likely to occur at that time. We hold that section 2 has no limiting effect on the general language of section 1 with respect to voter qualifications, and thus no limiting effect on congressional power under section 5.[66]

The sole question remaining in this case, then, is the following: Is the congressional determination that denying the right to vote to otherwise qualified citizens between the ages of 18 and 21 constitutes an invidious discrimination in violation of the Equal Protection Clause utterly lacking in rational support? Surely this is, as Mr. Justice Frankfurter observed in another setting,

"one of those rare instances where to state the question is in effect to answer it."[67] The fundamental importance of the right to vote is clear from the cases we have already cited. The hearings in Congress and the briefs in this case contain extensive citations of the maturity of 18-year-olds, their high level of education in comparison with voting citizens of the past, the extent to which state laws already treat them as mature adults, and their awesome duties to the country under federal law. We do not find it necessary to specify the weight that must be given these various factors when we review—under even the loosest standard—a congressional extension of the franchise to younger citizens. For the rationality of the congressional determination was virtually uncontested in this case, in the congressional debates, and in the public debate, of which we may take judicial notice.

Two sorts of arguments have dominated the field of opposition to section 302. On the one hand, the fear is expressed that Congress might later *deny* the vote to 18-year-olds. This is a danger precisely treated by footnote 10 of majority opinion in Katzenbach v. Morgan,[68] and it is clear that Congress would have a very difficult time justifying this enactment under section 5.[69] A

65. Const., art. I, § 2, cl. 3. *See* William W. Van Alstyne, The Fourteenth Amendment, The Right to Vote, and the Understanding of the Thirty-ninth Congress, 1965 Sup.Ct.Rev. 33, 44.

66. The only meaning we can attach to the first phrase of section 302 of the Voting Rights Act as amended ("Except as required by the Constitution, * * *") is that Congress meant to defer to the courts the resolution of this controversy concerning the effect of section 2. We think, however, that even in the absence of this phrase, the judicial branch would be required to decide this question independently. Whether section 2 limits section 1 is a narrowly legal question in the sense that it involves neither the appropriateness of certain action to secure a constitutional right, nor the establishing of a legal classification where complex sociological judgments regarding the invidiousness of a discrimination must be

evaluated. A contrary decision to the one we have reached on section 2 would mean that the Equal Protection right is inapplicable to voters under 21. Section 302 then would be beyond Congressional powers under section 5 of the Fourteenth Amendment.

67. Goesaert v. Cleary, 335 U.S. 464, 465, 69 S.Ct. 198, 199, 93 L.Ed. 163 (1948).

68. *See* p. 1005 *supra*.

69. There is no indication in the opinions of the Supreme Court that it would require other than the same "compelling interest" that it requires from the states when citizens are being denied the right to vote. Congress would be in an even more difficult position if it were trying to deny the right to vote to a group to which some states had decided to grant it. Would Congress be acting to enforce the Equal Protection Clause? It is difficult to construct an argument that permitting

related, but different fear is that Congress will simply repeal section 302. Whatever standard of review is applied to such congressional action,[70] 18-year-old citizens would certainly then be able to renew their judicial attack on any state law that went back into effect and denied them the vote. The difficult question whether these laws fall of their own weight under section 1 of the Fourteenth Amendment, which Congress by enacting section 302 has rendered it unnecessary for the Supreme Court to decide, would then have to be resolved.

On the other hand, the fear is expressed that Congress, in an ecstasy of reform, will prohibit states from denying the vote on the basis of age to those over 12, over 5, and so forth. Perhaps Congress could decide that age is an impermissible basis for classification for the purposes of voting. We do not mean to belittle this fear, nor to belittle the concerns which could lead Congress to consider such apparently far-fetched reforms. All we say now is that such measures—on a gradually increasing scale—will pose different questions. It may well be irrational for Congress to describe as an invidious discrimination a voting qualification which excludes a class the vast majority of which have *no* serious appreciation of the issues typically involved in a national, state or local election. We have seen no indication that opposition to *granting the vote to 18-year-olds is* based on such an argument.

We hold, accordingly, that section 302 of the Voting Rights Act as amended was an appropriate exercise of congressional power.

## ORDER

It is this 2nd day of October, 1970, in accordance with the opinions issued to-

day in the above-entitled action, ordered that counts 7 and 8 of plaintiffs' complaint, to the extent that they challenge section 5 of the Voting Rights Act Amendments of 1970, are *dismissed* without prejudice; and it is

Further ordered by this court that defendants' motions for summary judgment, as to counts 1 through 6 of plaintiffs' complaint and as to those portions of counts 7 and 8 which challenge section 4 of the Voting Rights Act Amendments of 1970, are *granted;* plaintiffs' cross motion for summary judgment on all counts is *denied.*

MacKINNON, Circuit Judge (concurring in part and dissenting in part):

I join the foregoing opinion except for its treatment of Title I, section 4 (relating to the trigger provisions for the literacy tests) because I view plaintiffs' attack on that section to be premature. I also have some additional views concerning the constitutionality of Title III.

### Title I—The Trigger Provisions

Section 4(b) of the Voting Rights Amendments of 1970 provides, *inter alia:*

> [T]he provisions of subsection (a) [Sec. 4(a) of the Voting Rights Act of 1965] shall apply in any State or any political subdivision of a State which (i) the Attorney General determines maintained on November 1, 1968, any test or device, *and with respect to which (ii) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1968, or that less than 50 per centum of such persons voted in the presidential election of November 1968.* (Emphasis added).[1]

18-year-olds to vote denies fundamental rights to those over 21 or discriminates against them invidiously.

**70.** Here, as in note 45 *supra,* we might observe that failure to prohibit a state practice is not necessarily authorization of that practice. *See also* the discussion of section 2 of the Fourteenth Amendment

*supra,* and Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) ; *cf.* Reitman v. Mulkey, 385 U.S. 967, 87 S.Ct. 500, 17 L.Ed.2d 431 (1967).

**1.** The determinations made in accordance with this section indicate the states or subdivisions which are to be subject to § 4(a) (suspending literacy tests), § 5 (re-

The requirement that the Director of the Census shall determine the factual matters specified in the statute requires such determination to be made concerning facts which existed on November 1, 1968. With respect to this statutory requirement the Director of the Census advised the Assistant Attorney General of the United States by letter of July 27, 1970 [2] that the Census Bureau "could not in good conscience make the determinations without the benefit of new benchmark data. New benchmark data. [would] be uniformly provided by the 1970 census results." He added it was necessary for the Census Bureau "to wait for the results of the 1970 census" which would not become available for New York until "toward the end of the year." [3] We are thus faced with the fact that the person designated by Congress in the statute to make the required important determinations that trigger the application of the Act has stated, in effect, that he cannot make a good faith determination of the required facts until later in the year when the necessary underlying data will be available, and with the fact that the required determination has not been made.

In the face of this recognition of the non-existence of the underlying factual material from which the statutory determination, in the opinion of the Census Director, *must* be made, and also the non-existence of the statutory determination by the Director, the majority opinion in footnotes 16 and 17 questions whether the Director of the Census has discretion to "delay" making the determination on the "best available figures." In my view it is not a question of discretion for the Director but a matter of what the statute directs him to determine and the date concerning which such determination must be made. In this respect the statute is very definite. He must determine the necessary facts involving population, registrations and voting as of November 1, 1968. And he has stated that he cannot do this in good conscience until the 1970 census figures are available. [4] Footnotes 16 and 17 suggest, in effect, that the Census Director, lacking the necessary 1970 data, should make the determinations on the basis of the 1960 census figures and implies that the court might so direct him to make his determination. [5] But the statute designates the Census Director as the person to make the decisions, and not this court or any other person. Furthermore, the decision of the Census Director on the matter is final and conclusive and "not reviewable in any court." [6] It is accordingly my opinion that there is no

---

quiring prior approval of changes in voting laws) and § 6 (relating to federal examiners) of the Act. Section 6 is not under attack in the instant case and plaintiffs' challenge to § 5 has been dismissed because it is premature. As used herein, the term "trigger provisions" refers to § 4(a) and (b) because they together operate to suspend the operation of literacy tests in certain states and political subdivisions.

2. *See* majority opinion, footnote 14.

3. *Id.*

4. To wait until then is not to delay. Delay would only occur if he failed to make his necessary decision within a reasonable time after the necessary data was available.

5. This would be the substantial equivalent of requiring a court to decide a case before all the evidence is in.

6. Sec. 4(b) of the Voting Rights Act of 1965, 79 Stat. 438, 42 U.S.C. § 1973b(b) (Supp. V, 1969), reads in part:

A determination or certification of the Attorney General or of the Director of the Census under this section or under section 1973d or 1973k of this title shall not be reviewable in any court and shall be effective upon publication in the Federal Register.

The language of the statute is sufficiently definite to preclude the operation of the general presumption of reviewability. *See* Schilling v. Rogers, 363 U.S. 666, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960); Calderon v. Tobin, 88 U.S.App.D.C. 134, 187 F.2d 514, cert. denied, 341 U.S. 935, 71 S.Ct. 854, 95 L.Ed. 1363 (1951). *See generally,* 4 K. Davis, Administrative Law Treatise § 28.15 (1958).

basis for the court in this case to question the Director's preliminary decision as to what underlying factual data he needs to permit him to make the statutory determination committed to his unreviewable judgment.

The court's opinion, however, does not go so far as to order the Director to make the determination on the basis of 1960 data. Rather, it states:

> [I]t is clear that there is a danger that Section 4(a) will apply to New York County, whenever the determination is made by the director of the census. Plaintiffs' assertions to this effect were uncontested by defendants.

In my view this holding that we are required to accept plaintiffs' factual assertions, which are contained in his brief and which do not even rise to the dignity of factual allegations in his pleadings, is impermissible. First, the court is denied the power to substitute its factual determination, or that of the plaintiff, for that of the Census Director by section 4(b) of the Voting Rights Act of 1965.[7] This section, as above stated, prohibits the court from reviewing the Director's determination and, in my opinion, even his preliminary determination that he cannot make the required determination without the 1970 census figures, is a "determination * * * under this section [§ 4(b)]"[8] of the Act. Secondly, the statute requires the determination to be made by the Census Director and that admittedly has not been made.

It seems clear that Congress intended a good faith determination to be made by the Director and that until the necessary underlying facts are available from which such determination can be made by the person designated by the statute it would not be sufficient to substitute a determination or mere allegation by another person which admittedly is based on factual data that the person designated by the Act considered to be inadequate. It is obvious that such would not be a determination by the Director of the Census.

Further, the statute directs that the Director of the Census shall "determine" the required factual matters. To determine something means "to fix conclusively or authoritatively * * * to settle a question or controversy * * *." Under its preferential dictionary definition the word means an *authoritative decision* on the matter involved. Webster's New International Dictionary 616 (3d ed. 1961). A secondary meaning of the word is "to establish causally." It is apparent from the context of this statute, and the vital importance of the matters that flow from the determination, that Congress intended to direct that an authoritative and not a casual determination was to be made. The determination was not to be a guess.[9] That is the difference between what footnote 16 would substitute for the Director's determination and my view of what the Act requires.

In sum, in my view of this proceeding in its present context, we are dealing with a motion for summary judgment in which it is admitted that the 1970 census figures are not available. It is also admitted that the Director of the Census has decided that he cannot make an accurate determination of the facts he is directed to make by the Act until the 1970 figures are available and necessarily that he has not made such determination. All this supports the conclusion that plaintiffs' attack on section 4 at the present time is premature. The essential facts are not presently known, the required determinations have not been made, and the requirements of the statute that the matter be determined on the basis of the stated facts as of November 1, 1968, and not on some other basis, cannot be evaded by substituting for the required facts conclusory allegations which all know have no true basis in fact. I would accordingly grant the

7. *See* note 6 *supra.*

8. *Id.*

9. I differ with the statement in the majority opinion which infers that "accuracy" of the determination is not essential. *See* note 16 of the majority opinion.

motions of the Attorney General and of the New York City Board of Elections for summary judgment and dismiss Counts 7 and 8 for failure to state a claim upon which relief can be granted. *See* South Carolina v. Katzenbach, 383 U.S. 301, 308, 317, 86 S.Ct. 803, 15 L.Ed. 2d 769 (1966); Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 162, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967); Davis v. Ichord, U.S.App.D.C. (No. 23426, Aug. 20, 1970) (Leventhal, J., concurring).[10] This suggested disposition of this phase of the case would, of course, not preclude any of the plaintiffs or others from bringing a suit after the Director of the Census has made the statutory determinations.

Another question is presented by that portion of the majority opinion which suggests because there is a substantial likelihood that Title I may apply to New York County that we should accordingly decide now upon its constitutionality. However, in view of our disposition of section 201, and since sections 4 and 5 raise difficult constitutional questions even beyond South Carolina v. Katzenbach, *supra,* the possibility that Title I will eventually become applicable to New York County does not justify us in undertaking to decide these issues at this time.

### Title III—The 18-year-old Voting Provision

In addition to the reasons announced in the majority opinion in my view there are additional reasons for holding that the 18-year-old voting provision con-

tained in section 302 of the 1970 Amendments is within the power of Congress conferred by the Fourteenth Amendment. It was argued before this court that the framers of the Fourteenth Amendment did not intend it to apply to voter qualifications and that the states,[11] under our constitutional system, would retain the exclusive power in that area. In support of this contention, plaintiffs referred to remarks made in the congressional debates which preceded the passage of the Fourteenth Amendment. The most emphatic statement to this effect was that made by Representative Bingham of Ohio, a member of the Joint Committee on Reconstruction and the author of section 1 of the Fourteenth Amendment:

> Allow me, Mr. Speaker, in passing, to say that this amendment takes from no State any right that ever pertained to it. No State ever had the right, under the forms of law or otherwise, to deny any freeman the equal protection of the laws or to abridge the privileges and immunities of any citizen of the Republic, although many of them have assumed and exercised the power, and that without remedy. The amendment does not give, as the second section shows, the power to Congress of regulating suffrage in the several States.

> The second section excludes the conclusion that by the first section suffrage is subjected to congressional law * * *.[12]

---

10. The issues involved in Title I were almost totally ignored in both the briefs and at oral argument. Nevertheless, with respect to § 4(a), I agree with the majority opinion that there is probably a case or controversy in the narrow sense and thus rest my disagreement on what I view to be a proper exercise of discretion by this court.

11. It is impliedly admitted by all the arguments that the strict language of the Fourteenth Amendment is broad enough to cover voter qualifications. Thus, the only means of escaping such interpretation is to prove a controlling contrary intention by those who caused it to be adopted, or

to rely upon the effect of other provisions of the Constitution upon the provisions of the Amendment, or a combination of both.

12. Cong.Globe, 39th Cong., 1st Sess. 2542 (1866). A number of other references to the congressional debates to the same general effect are set forth in the dissenting opinion of Mr. Justice Harlan in Reynolds v. Sims, 377 U.S. 533, 595–602, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *See also* Van Alstyne, The Fourteenth Amendment, The "Right" to Vote, and the Understanding of the Thirty-ninth Congress, 1965 Sup.Ct.Rev. 33.

Bingham also remarked:

> To be sure we all agree, and the great body of the people of this country agree, and the committee thus far in reporting measures of reconstruction agree, that the exercise of the elective franchise, though it be one of the privileges of a citizen of the Republic, is exclusively under the control of the States.[13]

Senator Howard, who was also a member of the Joint Committee, also indicated very strongly that section 1 did "not give to either of these classes [whites or blacks] the right of voting." He remarked,

> The right of suffrage is not, in law, one of the privileges or immunities thus secured by the Constitution. It is merely the creature of law. It has always been regarded in this country as the result of positive local law, not regarded as one of those fundamental rights lying at the basis of all society and without which a people cannot exist except as slaves, subject to a depotism [*sic.*].[14]

He later remarked:

> The committee were of opinion that the States are not yet prepared to sanction so fundamental a change as would be the concession of the right of suffrage to the colored race. We may as well state it plainly and fairly, so that there shall be no misunderstanding on the subject. It was our opinion that three fourths of the States of this Union could not be induced to vote to grant the right of suffrage, even in any degree or under any restriction, to the colored race. * * *
>
> The second section leaves the right to regulate the elective franchise still with the States, and does not meddle with that right.[15]

However, the congressional debates also reflected a number of statements by other members of Congress who placed a different interpretation upon the language used in the Amendment.

---

Rep. Bingham did, however, recognize the right of the people of each state to have a republican form of government. Cong.Globe 39th Cong., 1st Sess. 2542 (1866). Others contended that the Constitution conferred upon Congress the power to regulate suffrage so as to prevent widespread disenfranchisement. For example, Rep. Lawrence of Ohio, in discussing the Civil Rights Bill, stated:

> A State which denies to half its citizens, not only all political, but their essential civil rights, recognized and confirmed by the national Constitution and described in this bill, has ceased to be republican in form, and the Constitution has made it the duty of Congress to "guarantee" such form of government. This it may do by law in this form.

Cong.Globe, 39th Cong., 1st Sess. 1836–37 (1866). Rep. Eliot of Massachusetts, discussing the precursor to § 2 of the Fourteenth Amendment, stated:

> [W]hile the Constitution now says that Congress shall guaranty to every State a republican form of government, this amendment as reported by the committee admits by implication that, although a State may so legislate as to exclude these multitudes of men, not on account of race or color, but on account of property, yet, nevertheless, she would have a republican form of government, and that Congress will not and ought not to interfere.

*Id.* at 407. *See also* Van Alstyne, *supra* at 49–53, containing the views of Farnsworth of Illinois, Shellabarger of Ohio, Cook of Illinois and Julian of Indiana. The Supreme Court held that the question of what constitutes a republican form of government is a political question for the Congress alone to answer. Luther v. Borden, 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849). *See also* Baker v. Carr, 369 U.S. 186, 209–232, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Ohio ex rel. Bryant v. Akron Metropolitan Park District, 281 U.S. 74, 80, 50 S.Ct. 228, 74 L.Ed. 710 (1930); Mountain Timber Co. v. Washington, 243 U.S. 219, 234, 37 S.Ct. 260, 61 L.Ed. 685 (1917).

13. Cong.Globe, 39th Cong., 1st Sess. 2542 (1866).

14. *Id.* at 2766.

15. *Id.* It is clear that these remarks of Senator Howard were addressed to the "privileges and immunities" portion of section 1 and to section 2 and not to the equal protection provision.

These are gathered in an article by Professor Van Alstyne.[16] The remark with the greatest force and weight to this effect was that made by Representative Rogers of New Jersey, also a member of the Joint Committee on Reconstruction:

[The proposed Amendment] provides that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny any person within its jurisdiction the equal protection of the laws. What are privileges and immunities? Why, sir, all the rights we have under the laws of the country are embraced under the definition of privileges and immunities. The right to vote is a privilege. The right to marry is a privilege. The right to contract is a privilege. The right to be a juror is a privilege. The right to be a judge or President of the United States is a privilege. I hold if [the proposed Amendment] ever becomes a part of the fundamental law of the land it will prevent any State from refusing to allow anything to anybody under this term of privileges and immunities.[17]

The foregoing quotations must be read in light of the fact that there appear to have been two bodies of thought prevalent in Congress at the time concerning congressional power to regulate suffrage. One group were of the opinion that Congress had some power over suffrage qualifications by Art. IV, § 4 [18] guaranteeing a republican form of government; by Art. I, § 4, cl. 1 [19] giving Congress power to "make or alter" state regulations as to "the times * * * and manner of holding elections for Senators and Representatives"; and by the provision of Art. I, § 2, cl. 1 [20] which recites that the House of Representatives shall be composed of members "chosen * * * by the *people* of the several states." (Emphasis added.) Members of this group who contended that the Fourteenth Amendment did not confer power on Congress to regulate suffrage were not necessarily contending that Congress was to be powerless in the area.[21] The other group did not consider that the Constitution conferred any power in Congress to deal with voter qualifications. Doubtlessly, this latter group relied heavily upon the provisions of Art. I, § 2, cl. 1 [22] that for the House of Representatives "the electors in each State shall have the Qualifications

16. *See* note 12 *supra.*

17. Cong.Globe, 39th Cong., 1st Sess. 2538 (1866). Others who voiced similar sentiments included Rep. Boyer of Pennsylvania, *id.* at 2467, Rep. Phelps of Maryland, *id.* at 2398, and Rep. Niblack of Indiana, *id.* at 2465.

18. U.S.Const. Art. IV, § 4:
The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.

19. U.S.Const. art. I, § 4, cl. 1:
The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators.

In Minor v. Happersett, 88 U.S. (21 Wall.) 162, 171, 22 L.Ed. 627 (1875), Chief Justice Waite recognized the possible role of Congress when he commented on Art. I, § 4 of the Constitution:
It is not necessary to inquire whether this power of supervision thus given to Congress is sufficient to authorize any interference with the State laws prescribing the qualifications of voters, for no such interference has ever been attempted. The power of the State in this particular is certainly supreme *until Congress acts.* (Emphasis added).

20. U.S.Const. art. I, § 2, cl. 1:
The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.

21. *See* note 12 *supra.*

22. *Id.*

requisite for Electors of the most numerous Branch of the State Legislature." In effect this allowed the state legislatures to set voter qualifications. Some of this group argued that the Fourteenth Amendment contained the potential to confer powers over voter qualifications upon Congress.[23]

The passage of the Amendment thus did not find all parties in agreement on the precise effect it had on the power of the states to regulate suffrage. Nor was the debate ended by the submission of the Amendment to the states and its subsequent ratification.

During the debates which preceded the passage of the Fifteenth Amendment, it was argued by Senator Doolittle of Wisconsin that such Amendment was necessary because the Fourteenth had left state control over suffrage unimpaired.[24] Senator Sumner of Massachusetts, on the other hand, argued that the Fifteenth was unnecessary because the guarantees it contained had already been effected by the Fourteenth Amendment.[25] Representative Stevens in 1868 also expressed a similar view although he had not done so explicitly in the congressional debates on the Fourteenth Amendment.[26]

It thus appears that the legislative history of the Fourteenth Amendment is inconclusive and cannot be relied upon to fully support either contention or to furnish a dependable basis for interpreting the Amendment. *See* Afroyim v. Rusk, 387 U.S. 253, 267, 87 S.Ct. 1660, 18 L. Ed.2d 757 (1967). *Compare* Adamson v. California, 332 U.S. 46, 68–123, 67 S. Ct. 1672, 91 L.Ed. 1903 (1947) (Black, J., dissenting) and Crosskey, Charles Fairman, "Legislative History," and the Constitutional Limitations on State Authority, 22 U.Chi.L.Rev. 1 (1954) *with* Fairman, Does the Fourteenth Amendment Incorporate the Bill of Rights? The Original Understanding, 2 Stan.L. Rev. 5 (1949). In the Congress itself there were conflicting opinions as to the effect of what they were doing by the language of the Amendment as adopted and these variable opinions have persisted to the present day. This requires us to rely heavily upon the ordinary meaning of the words used.

This is no less true of the question of the proper age for voting than it is for

---

23. *See* note 17 *supra.* The assertion of these numerous differing constructions which were prevalent in Congress contemporaneously with the formulation of the amendment should have alerted those who asserted a different construction to the necessity of including a specific exemption for elections if they desired to exempt elections from the normal meaning of the words used.

24. Cong.Globe, 40th Cong., 3d Sess., App. 152 (1869).

25. Cong.Globe, 40th Cong., 3d Sess. 1008 (1869).

26. In support of a bill, grounded in § 1 of the Fourteenth Amendment, to prohibit the states from denying the right to vote on account of race, Rep. Stevens remarked:

Since the adoption of the fourteenth amendment * * * I have no doubt of our full power to regulate the elective franchise, so far as it regards the whole nation, in every State of the Union, which, when tried, I hope, will be so formed as to be beneficial to the nation,

just to every citizen, and carry out the great designs of the framers of the Government, according to their views expressed in the Declaration of Independence. * * *

The fourteenth amendment, now so happily adopted, settles the whole question and places every American citizen on a perfect equality so far as merely national rights and questions are concerned. * * *

If by the amended Constitution every American citizen is entitled to equal privileges with every other American citizen, and if every American citizen in any of the States should be found entitled to impartial and universal suffrage with every other American in any State, then it follows as an inevitable conclusion that suffrage, throughout this nation is impartial and universal so far as every human being, without regard to race or color, shall be found concerned, and so far as it affects the whole nation.

Cong.Globe, 40th Cong., 2d Sess. 1966–67 (1868).

voting in general. The argument has been made here and in Congress that because section 2 of the Fourteenth Amendment prescribed a penalty for states which denied the vote to persons over twenty-one, that this precluded a finding that it was a denial of equal protection to deny the vote to persons under twenty-one.[27]

However, as the majority points out, section 2 of the Fourteenth Amendment provides a specific remedy for a specific type of abuse. It does not purport otherwise to establish the age for voting. In addition, members of Congress had differing views concerning the reason that twenty-one was considered an appropriate voting age. Representative Schenck of Ohio, responding to a suggestion that representation in Congress should be based on population, suggested that it should be based on suffrage, and that suffrage should be limited to male citizens over twenty-one years of age. He stated his reason for choosing twenty-one:

> I take twenty-one years of age because, I believe, in every State in the Union that has always been and is now the line between the adult and the minor.[28]

But the line between adult and minor was, in his view, a line to be drawn pragmatically:

> [I]n every country, the age of majority, not being a thing which is settled by natural right, is to be settled according to the best exercise of discrimination on the subject, and the best consideration that is to be given to questions of expediency by those who framed the institutions of that Government.[29]

Senator Poland of Vermont considered the question of the voting age to be capable of differing answers:

> [W]e all know that many females are far better qualified to vote intelligently and wisely than many men who are allowed to vote; and the same is true of many males under twenty one * *. The truth is that the whole system of suffrage in any republican State is wholly artificial, founded upon its own ideas of the number and class of persons who will represent the wishes and interests of the whole people.[30]

Others during the same era attached more significance to the age limit. During the debates concerning the qualifications for suffrage in the District of Columbia, Senator Morrill of Maine remarked:

> "Manhood suffrage" to define it, is simply to state the conditions of manhood, the state of an adult male grown to full size and strength * * *. In most nations, for purposes of war, it is a male person between the ages of eighteen and forty five years. Among the civilians it was from fourteen to twenty-five. * * *

> The fatal objection to "manhood suffrage" is that the right is based on physical development, like arms bearing, while the act [of voting] itself necessarily implies intelligence, discretion, intellectual development.

> * * * * * *

> The American principle favors the right of suffrage for the male citizen of full age, supposed to be based upon the law and usage that at this age he becomes free of the tutelage of family and is free to manage his own affairs.[31]

---

27. *See* statement and testimony of Dean Louis Pollak, Yale Law School. Hearings on S.J. Res. 7 et al., Before the Subcomm. on Constitutional Amendments of the Senate Judiciary Committee, 91st Cong., 2d Sess. 249–73 (Comm.Print 1970); letters from Professors Bickel, et al. and Casper, 116 Cong.Rec. H5648–49 (daily ed. June 17, 1970).

28. Cong.Globe, 39th Cong., 1st Sess., App. 298 (1866).

29. *Id.*

30. *Id.* at 2962.

31. Cong.Globe, 39th Cong., 2d Sess. 40 (1866).

In a similar vein, Senator Bayard of Delaware remarked during the debates over the Fifteenth Amendment:

> [T]he age is fixed arbitrarily at twenty-one, founded no doubt upon the principle that the human passions develop more rapidly than the intellectual and the reflecting powers, and that the control over the passions is not sufficient under the age of twenty-one to trust men with the exercise of the franchise. The result would be personal conflicts and riots at elections, becoming so general that to avoid anarchy the people would accept despotism. There are boys of eighteen who might be safely entrusted with suffrage, but no tribunal could be possibly organized to determine fairly on individual exceptions. * * * To use the slang of the day, the community has not yet been educated up to the idea because some boys of eighteen may have more intellect and self-control than the average man of forty, and be quite competent to exercise the franchise of voting, that therefore all boys of eighteen ought to enjoy the franchise. But in this age of progress * * * no prediction can be made as to when this question will seriously arise.[32]

Other quotations, on both sides of the question, can be found.[33] When they are totaled, however, they do not definitively answer the question of the proper age for voting any more than other remarks indicate conclusively whether or not the Fourteenth Amendment was intended to apply to voting at all.

The usual caveats concerning the use of legislative history in statutory interpretation[34] apply with similar force to attempts to interpret constitutional amendments. However, there is a difference in that the views of the ratifying states as to the meaning of the Amendment may not correspond to the views of the people who drafted and debated the provision in Congress and because their approval is necessary to its adoption their intention is also material.[35] The states would be inclined to make independent judgments concerning the meaning of the Amendment based on the language of the Amendment itself. The current meaning of the Amendment must be determined, therefore, from the words themselves, their origin and "line of growth"[36] as much as, if not more than, from the intentions of the men who wrote them as those intentions are revealed in congressional debates.

Not only is there no showing, therefore, that the Fourteenth Amendment precludes a congressional enactment setting the voting age at eighteen, but there is abundant evidence that Congress had the power to interpret that Amendment for itself and to pass legislation in keeping with its interpretation.[37] This it has done here and it is my opinion that in doing so it has acted within its con-

---

32. Cong.Globe, 40th Cong., 3d Sess., App. 168 (1869).

33. *See, e. g.*, Cong.Globe, 39th Cong., 2d Sess. 43 (1866) (Remarks of Senator Willy of West Virginia).

34. *See* A. Bickel, Politics and the Warren Court 212 (1965). *See generally*, Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527 (1947).

35. This seems to have been recognized by the drafters of the Fourteenth Amendment themselves. See the remarks of Rep. Stevens, Cong.Globe, 39th Cong., 1st Sess. 2459 (1866).

36. Gompers v. United States, 233 U.S. 604, 610, 34 S.Ct. 693, 58 L.Ed. 1115 (1914) (per Holmes, J.). *See also* Harper v. Virginia State Board of Elections, 383 U.S. 663, 669, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169 (1966) ("Notions of what constitutes equal treatment for purposes of the Equal Protection Clause *do* change.").

37. The results might be subject to different treatment in the courts, depending upon the provision of the Constitution under which Congress acts; but the necessity for a member of Congress, or Congress itself, to interpret the Constitution occurs almost daily. That duty arises with respect to every piece of legislation. *See generally* D. Morgan, Congress and the Constitution (1966).

stitutional power as presently interpreted by the Supreme Court.[38]

## APPENDICES TO THE OPINION OF THE COURT

### Appendix A

*Provisions of the Voting Rights Act Amendments of 1970*

SEC. 2. The Voting Rights Act of 1965 (79 Stat. 437; 42 U.S.C. 1973 et seq.) is amended by inserting therein, immediately after the first section thereof, the following title caption:

### "TITLE I—VOTING RIGHTS"

[Sections 3, 4 and 5 of the 1970 Amendments affect sections 4(a), 4(b), and 5 of the Voting Rights Act of 1965 (79 Stat. 438–39; 42 U.S.C. 1973b & –c). The changes are marked in the full quotation of sections 4(a), 4(b), and 5 as amended in Appendix B *infra*.]

SEC. 6. The Voting Rights Act of 1965 * * * is amended by adding at the end thereof the following new titles:

### "TITLE II—SUPPLEMENTAL PROVISIONS

### "Application of Prohibition to Other States

"SEC. 201. (a) Prior to August 6, 1975, no citizen shall be denied, because of his failure to comply with any test or device, the right to vote in any Federal, State, or local election conducted in any State or political subdivision of a State as to which the provisions of section 4 (a) of this Act are not in effect by reason of determinations made under section 4(b) of this Act.

"(b) As used in this section, the term 'test or device' means any requirement that a person as a prerequisite for voting or registration for voting (1) demonstate the ability to read, write, understand, or interpret any matter, (2) dem-

onstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

### "Residence Requirements for Voting

"SEC. 202. (a) The Congress hereby finds that the imposition and application of the durational residency requirement as a precondition to voting for the offices of President and Vice President, and the lack of sufficient opportunities for absentee registration and absentee balloting in presidential elections—

"(1) denies or abridges the inherent constitutional right of citizens to vote for their President and Vice President;

"(2) denies or abridges the inherent constitutional right of citizens to enjoy their free movement across State lines;

"(3) denies or abridges the privileges and immunities guaranteed to the citizens of each State under article IV, section 2, clause 1, of the Constitution;

"(4) in some instances has the impermissible purpose or effect of denying citizens the right to vote for such officers because of the way they may vote;

"(5) has the effect of denying to citizens the equality of civil rights, and due process and equal protection of the laws that are guaranteed to to them under the fourteenth amendment; and

"(6) does not bear a reasonable relationship to any compelling State interest in the conduct of presidential elections.

"(b) Upon the basis of these findings, Congress declares that in order to secure and protect the above-stated rights of citizens under the Constitution, to en-

---

38. I see no necessity for discussing the extreme suggestion that Congress might prohibit states from denying the vote to those over 12, over 5 and so forth or that Congress could decide that age is an imper-

missible basis of classification for voting purposes. *See* majority opinion at pp. 1010–1011. Rebutting such arguments emphsizes them beyond their merits.

able citizens to better obtain the enjoyment of such rights, and to enforce the guarantees of the fourteenth amendment, it is necessary (1) to completely abolish the durational residency requirement as a precondition to voting for President and Vice President, and (2) to establish nationwide, uniform standards relative to absentee registration and absentee balloting in presidential elections.

"(c) No citizen of the United States who is otherwise qualified to vote in any election for President and Vice President shall be denied the right to vote for electors for President and Vice President, or for President and Vice President, in such election because of the failure of such citizen to comply with any durational residency requirement of such State or political subdivision; nor shall any citizen of the United States be denied the right to vote for electors for President and Vice President, or for President and Vice President, in such election because of the failure of such citizen to be physically present in such State or political subdivision at the time of such election, if such citizen shall have complied with the requirements prescribed by the law of such State or political subdivision providing for the casting of absentee ballots in such election.

"(d) For the purposes of this section, each State shall provide by law for the registration or other means of qualification of all duly qualified residents of such State who apply, not later than thirty days immediately prior to any presidential election for registration or qualification to vote for the choice of electors for President and Vice President or for President and Vice President in such election; and each State shall provide by law for the casting of absentee ballots for the choice of electors for President and Vice President, or for President and Vice President, by all duly qualified residents of such State who may be absent from their election district or unit in such State on the day such election is held and who have applied therefor not later than seven days

immediately prior to such election and have returned such ballots to the appropriate election official of such State not later than the time of closing of the polls in such State on the day of such election.

"(e) If any citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any election for President and Vice President has begun residence in such State or political subdivision after the thirtieth day next preceding such election and, for that reason, does not satisfy the registration requirements of such State or political subdivision he shall be allowed to vote for the choice of electors for President and Vice President, or for President and Vice President, in such election, (1) in person in the State or political subdivision in which he resided immediately prior to his removal if he had satisfied, as of the date of his change of residence, the requirements to vote in that State or political subdivision, or (2) by absentee ballot in the State or political subdivision in which he resided immediately prior to his removal if he satisfies, but for his nonresident status and the reason for his absence, the requirements for absentee voting in that State or political subdivision.

"(f) No citizen of the United States who is otherwise qualified to vote by absentee ballot in any State or political subdivision in any election for President and Vice President shall be denied the right to vote for the choice of electors for President and Vice President, or for President and Vice President, in such election because of any requirement of registration that does not include a provision for absentee registration.

"(g) Nothing in this section shall prevent any State or political subdivision from adopting less restrictive voting practices than those that are prescribed herein.

"(h) The term 'State' as used in this section includes each of the several States and the District of Columbia.

"(i) The provisions of Section 11(c) shall apply to false registration, and other fraudulent acts and conspiracies, committed under this section.

## "Judicial Relief

"SEC. 203. Whenever the Attorney General has reason to believe that a State or political subdivision (a) has enacted or is seeking to administer any test or device as a prerequisite to voting in violation of the prohibition contained in section 201, or (b) undertakes to deny the right to vote in any election in violation of section 202, he may institute for the United States, or in the name of the United States, an action in a district court of the United States, in accordance with sections 1391 through 1393 of title 28, United States Code, for a restraining order, a preliminary or permanent injunction, or such other order as he deems appropriate. An action under this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2282 of title 28 of the United States Code and any appeal shall be to the Supreme Court.

## "Penalty

"SEC. 204. Whoever shall deprive or attempt to deprive any person of any right secured by section 201 or 202 of this title shall be fined not more than $5,000, or imprisoned not more than five years, or both.

## "Separability

"SEC. 205. If any provision of this Act or the application of any provision thereof to any person or circumstance is judicially determined to be invalid, the remainder of this Act or the application of such provision to other persons or circumstances shall not be affected by such determination.

## "TITLE III—REDUCING VOTING AGE TO EIGHTEEN IN FEDERAL, STATE, AND LOCAL ELECTIONS

## "Declaration and Findings

"SEC. 301. (a) The Congress finds and declares that the imposition and application of the requirement that a citizen be twenty-one years of age as a precondition to voting in any primary or in any election—

"(1) denies and abridges the inherent constitutional rights of citizens eighteen years of age but not yet twenty-one years of age to vote—a particularly unfair treatment of such citizens in view of the national defense responsibilities imposed upon such citizens;

"(2) has the effect of denying to citizens eighteen years of age but not yet twenty-one years of age the due process and equal protection of the laws that are guaranteed to them under the fourteenth amendment of the Constitution; and

"(3) does not bear a reasonable relationship to any compelling state interest.

"(b) In order to secure the constitutional rights set forth in subsection (a), the Congress declares that it is necessary to prohibit the denial of the right to vote to citizens of the United States eighteen years of age or over.

## "Prohibition

"SEC. 302. Except as required by the Constitution, no citizen of the United States who is otherwise qualified to vote in any State or political subdivision in any primary or in any election shall be denied the right to vote in any such primary or election on account of age if such citizen is eighteen years of age or older.

## "Enforcement

"SEC. 303. (a) (1) In the exercise of the powers of the Congress under the necessary and proper clause of section 8, article I of the Constitution, and section 5 of the fourteenth amendment of the Constitution, the Attorney General is authorized and directed to institute in the name of the United States such actions against States or political subdivisions, including actions for injunctive relief, as he may determine to be neces-

sary to implement the purposes of this title.

"(2) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this title, which shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code, and any appeal shall lie to the Supreme Court. It shall be the duty of the judges designated to hear the case to assign the case for hearing and determination thereof, and to cause the case to be in every way expedited.

"(b) Whoever shall deny or attempt to deny any person of any right secured by this title shall be fined not more than $5,000 or imprisoned not more than five years, or both.

### "Definition

"SEC. 304. As used in this title the term 'State' includes the District of Columbia.

### "Effective Date

"SEC. 305. The provisions of title III shall take effect with respect to any primary or election held on or after January 1, 1971."

### Appendix B

*Sections 4(a), 4(b), and 5 of the Voting Rights Act of 1965 as amended by Sections 3, 4, and 5 of the 1970 Amendments*

[Deleted material is in brackets; new material is italicized.]

SEC. 4. [42 U.S.C. § 1973b]. (a) To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been made under subsection (b) or in any political subdivision with respect to which such determinations have been made as a separate unit, unless the United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the [five years] *ten years* preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color: *Provided,* That no such declaratory judgment shall issue with respect to any plaintiff for a period of [five years] *ten years* after the entry of a final judgment of any court of the United States, other than the denial of a declaratory judgment under this section, whether entered prior to or after the enactment of this subchapter, determining that denials or abridgements of the right to vote on account of race or color through the use of such tests or devices have occurred anywhere in the territory of such plaintiff.

An action pursuant to this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court. The court shall retain jurisdiction of any action pursuant to this subsection for five years after judgment and shall reopen the action upon motion of the Attorney General alleging that a test or device has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color.

If the Attorney General determines that he has no reason to believe that any such test or device has been used during the [five years] *ten years* preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color, he shall consent to the entry of such judgment.

(b) The provisions of subsection (a) shall apply in any State or in any political subdivision of a state which (1) the Attorney General determines maintained

on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964. *On and after August 6, 1970, in addition to any State or political subdivision of a State determined to be subject to subsection (a) pursuant to the previous sentence, the provisions of subsection (a) shall apply in any State or any political subdivision of a State which (i) the Attorney General determines maintained on November 1, 1968, any test or device, and with respect to which (ii) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1968, or that less than 50 per centum of such persons voted in the presidential election of November 1968.*

A determination or certification of the Attorney General or of the Director of the Census under this section or under section 6 or section 13 shall not be reviewable in any court and shall be effective upon publication in the Federal Register.

[Subsections 4(c) to (e) were unchanged by the 1970 Amendments.]

SEC. 5 [42 U.S.C. § 1973c]. Whenever a State or political subdivision with respect to which the prohibitions set forth in section [4] (a) *based upon determinations made under the first sentence of section [4] (b)* are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, *or whenever a State or political subdivision with respect to which the prohibitions set forth in section [4] (a) based upon determinations made under the second sentence of section [4] (b) are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968,* such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.